Good morning, Your Honors. Josh Lee from the Federal Public Defender's Office for Mr. Bush. At Mr. Bush's capital sentencing, the prosecution violated every single restriction that the Supreme Court has placed on victim impact testimony. It deliberately and repeatedly induced the victim's family to, it invited what the OCCA characterized as impassioned pleas and strenuous demands for the death penalty. The prosecution repeatedly and deliberately induced the victim's family to give extended denunciations of Mr. Bush's character as a person and offer inflammatory and speculative characterizations of the offense. And not even the state disputes that this violated Mr. Bush's clearly established constitutional rights. What did the OCCA tell us about this issue? It did two things. Um, the OCCA said that the claim was procedurally barred because he didn't object at trial. And it said that the testimony was permissible. Um, as to the first of those, um, it was not, it is not procedurally defaulted because notwithstanding what the OCCA said, Mr. Bush did raise the issue in pre-trial objections, this exact issue. Um, he renewed his objections just before the witnesses testified. Um, then he raised this exact same issue in his direct appeal brief to the OCCA. How specific were his objections before the testimony? I mean, certainly they were allowed to have victim impact testimony. His, uh, his objections in the pre-trial response that he renewed were very specific. So, uh, he objected to, uh, the, they, they disclosed this victim impact testimony in written statements before the trial, which is what they're required to do under Oklahoma law. Um, he objected citing Booth and Payne and, uh, several 10th circuit cases and said that under, notwithstanding what Oklahoma says, you're not allowed to offer recommendations for the death penalty under Booth. They also objected to the elaborations of those recommendations. They objected to brutal and they objected to characterizing Mr. Bush, particularly as a continuing threat. And then they told the judge, we're about to get into victim impact testimony. We filed a response to the state's victim impact disclosure. We want to renew that. And the judge allowed the test. And the judge said what? Something about the state knows the rule and they'll stay within it or something. Exactly, exactly. Right. Um, so, uh, that's what the judge said. And then also on direct appeal, we again cited Booth and Payne and said, you know, you have misconstrued Booth and Payne. You're not allowed to do this. Uh, the victim's family wasn't allowed to make pleas for the death penalty. They weren't allowed to characterize what, what, uh, what difference does it make here? If you think there is a difference by the fact that we have a sentencing by the court as opposed to a sentencing by the jury. Don't we, don't we presume here that the judge followed the law and would not rely on inadmissible evidence? Not in this case. In most cases you do. But the problem is the notion that the judge wouldn't consider inadmissible evidence presumes that the judge knows it's inadmissible. And here we know that the judge believed it was admissible and should be considered because he allowed it over. Well, he, he noted that there was, there, there were limits. That's, that was the little statement he made. The state knows that there are limits and I think they'll follow the rule or however loosely he said it. So that would state disclosed the victim impact testimony before trial. And so the judge obviously believed that nothing the state disclosed violated, uh, Oklahoma law. And the judge certainly thought that, uh, thought that victims families pleading for the death penalty was allowed because the OCCA had repeatedly told him it was allowed. There's, uh, Now the difference between the written victim impact statements and then the follow up oral colloquy that occurred between counsel and these individuals, are you objecting to both the written and the oral responses to questions by the prosecutor? Yes. Most of the oral responses to questions were contained in the written statements. So the, the written statements answered various particular questions like, do you have a recommendation for the judge on the penalty? And so the prosecution at the end would say, all right, let's go to the final question. What is your recommendation to the court? Now there were some differences between the oral testimony and the written testimony. Um, and there, I have two responses to that. The first is that as the prosecution, um, or I'm sorry, the state admits in their brief after the defendant had made his position known and the judge indicates that he believes this testimony is admissible. Further objections on the same issue would have been futile and we don't procedurally default people for failing to make continuing objections on the same matter that are futile. Uh, that's from Osborne versus Ohio that I cite in my brief. And, um, Lee versus Kim also says that if you raise the issue in a manner that would allow the judge to decide the basic issue that that's sufficient to preserve legitimate state interest and failure to go through a meaningless ritual after that doesn't result in a federal default. Um, so if not procedurally defaulted, where does that leave us? Um, that leaves the court deciding the merits and first that would be DeNovo. So the first thing you do is ask, did the OCC a unreasonably apply or contradict Supreme Court precedent? We know they did. That's this court's decision and dot. So then you would go to prejudice, um, and you evaluate it under the Breck standard, which is basically, is there a reasonable likelihood that the result would have been different? Um, and in this case it's clear that there was. Does the state even make an argument that there wasn't? Yes, the state does. Um, at least that's how I read his brief. So on the victim impact issue, issue two, they just argue procedural default. But then when they go to the ineffective assistance of counsel claim, they say it wouldn't have made a difference. And I read that as going back to what we have some guidance in our prior cases as to how to look at these kinds of issues. The victim impact issues, uh, Underwood, uh, we got into that and we looked at a news for guidance. Uh, Dodd, could you compare what happened in Dodd to what we have here? Yeah. Um, so the first thing that you look at is how egregious the statements were. The drumbeat. We have the drumbeat. And the statements here were way more egregious than in Dodd. Um, in Dodd, uh, there were seven recommendations for the death penalty, but they weren't the same sort of impassioned pleas that we got in this case. The state admits that the first factor cuts in our favor. Then, uh, the second one is the, uh, strength of the case in aggregate aggravation. Um, and in this case, although there were three aggravating factors, it wasn't especially strong as compared to some of these, uh, this court's other cases where they're just these vicious killings, you know, all. Here you're here. You're dragging a person behind a pickup truck. Who's alive? No, there's no injured, injured and alive. There's no evidence in the record that he was injured or alive. None of the state courts found. Uh, yeah, that, that right. The impermissible proffer that was not evidence and shouldn't have been forensic evidence. Uh, no. The medical examiner said that she could not tell how long he lived after the first shot. Um, she could not tell how long he remained alive, how long he remained conscious and could not say whether or not he was alive when he was dragged. And that that's no evidence at all. Um, so there's no evidence that he was alive when he was dragged and you know, as a gory as it was hiding the body after the offense and even damaging the body after the offense is just not an aggravating circumstance under Oklahoma law and can't be considered. But what case tells us that, uh, well, so that's from the Oklahoma's aggravating circumstances and the heinous, atrocious and cruel, uh, aggravating circumstance says that there has to be conscious physical suffering before, before death. Well, he was shot. He did not die instantaneously. We know that he tried to move and get away. He was shot again. Now I think we have proof of pain before death. Um, there's really no point in fighting that one. I think, I think that my point is all murders are terrible. Um, this way, nothing is heinous, atrocious or cruel. Um, so, uh, I, my position is that the evidence was insufficient for that. Uh, if it was sufficient, it wasn't, um, within the class of this court's cases where they linger for 20 or 30 minutes and are burned alive or are raped repeatedly before the offense. Um, I just think that dying of guns, gunshot wounds is separate from that. But then you get to the third factor, um, which is the strength of the case and mitigation and the mitigation case, um, here was strong. Um, he, uh, presented compelling evidence that circumstances that he wasn't culpable for contributed to the offense. So, uh, it's undisputed, at least at this stage in the case that he was suffering from bipolar disorder. He was in such mental distress in the days leading up to the offense that he had to be hospitalized. The hospital, unfortunately, didn't treat him appropriately and instead prescribed him a drug that is contraindicated for bipolar disorder and is known to induce violence in bipolar disorder patients. And, uh, his expert witness testified that there was a causal link between the activation of his mania with the drug that he was prescribed and the offense that was committed. That's powerful mitigating evidence. Um, there's also the fact, um, that the OCCA found that the prosecution hadn't proved that he committed any prior act of violence that distinguishes some of this court's prior cases where the court said it was harmless, where the defendant had a dark history of violence. And that's just not the case here. And then finally, there was compelling evidence of remorse and acceptance of responsibility. He confessed after the offense. The prosecution's own witness, the sheriff, said that he was very remorseful and overcome with grief. And then he pleaded guilty to spare the victim's family from going through the trial. So, um, yes, murders are bad. And so this was a bad murder. But when you look at all the factors and weigh them against each other, the egregious nature of the testimony, the strength of the case in aggravation, and the strength of the case in mitigation, there's at least a reasonable likelihood that the judge would have made the balancing decision differently. Um, the other thing that I want to refer to is if you compare this case to Dodd, which is a, um, which is a case where the court found that the evidence was prejudicial. One thing that the court emphasized is that the prosecution in Dodd obviously thought that the victim impact testimony was important because he repeatedly elicited the testimony. And the court said, who are we to second guess the prosecutor who has more experience with this than we do on what testimony made the difference? And the prosecutor here, um, deliberately elicited this testimony from five different witnesses and then harped on it in closing argument. Um, the, uh, the, um, prosecutor said that the victim's family wouldn't get closure unless he were sentenced to death. Um, the, uh, prosecutor urged the judge effectively, urged the judge to make his decision on emotional grounds. Specifically what he said is you have to feel it in your heart. The death penalty is appropriate for Ronson Bush. Do we, do we measure it differently if it's a trial judge as opposed to a jury? So in many cases you probably would, um, because you assume that the judge ignores inadmissible evidence. But again, in this case you don't because the judge believed it was something that he should consider. I think, um, I'm going to do what Mr. Gruel did in his first argument and say there's a case that I cite on a general point related to this issue. But I went back and looked at it and it's more specifically relevant. Um, it's the Wong Son case and I cited for the proposition that this presumption of regularity can be rebutted. But you go back and look at it specifically and what the court says is that fruit of the poisonous tree or it is. Yes. So when you go back and look at it, that was, that was, that was a bench trial. Um, and what the court said is, yes, this was a bench trial. This is on page 492 of Wong Son. Um, uh, yes, this was a bench trial, but the defendant objected to this testimony. The judge allowed it anyway, so we presume he considered it. Well, but again, we had the trial judge, I think the third time I've said this, the trial judge said, okay, I hear your objection. The state knows what the rules are and I expect the state to follow the rules. So it's not that the court was just willing to hear anything from anybody or that the court was not aware that there were limits. But the rule in Oklahoma was wrong. The rule in Oklahoma contradicts clearly established federal law. So the judge would have taken into account the victim's family's pleas for the death penalty because he overruled objections that those shouldn't be considered. And because the OCCA had repeatedly told him that he should consider that. Um, so, uh, uh, so that's how we know that the judge did consider. So really you're arguing for a presumption the other direction that if the judge allows that testimony, we should presume that it was prejudicial. Um, I'm arguing that if the judge allows the testimony over objection, we presume that he considered it. So what that does is knock out the presumption that the judge doesn't consider inadmissible evidence. So at that stage, you effectively treat the judge like you would treat a jury. And I still need to make some showing of prejudice as if it were in front of a jury. And I've done that in this case. And, and you have to overcome all of the evidence in support of the aggravator. So my, my 23 witnesses, my position is not that there was no aggravator established. He was eligible for the death penalty. No question about that. He was eligible. That's not the important decision that the senator had to make, though. The important decision that the senator had to make was, okay, I've got at least one, three aggravators established. Now I have to decide how much those aggravators weigh and balance that against the mitigating circumstances and decide whether that outweighs. And that's where the victim impact testimony comes into play, is when the judge is weighing the aggravation against the mitigation. Could I get back to your response about the forensic pathologist? Yes. I don't know how to pronounce the name. Yacob? I have no idea. We'll go with that. I thought that she specifically testified that it was her, quote, opinion that the injuries that he sustained when he was being dragged on his nose and his mouth and his chin were not post-mortem wounds. She did say that. If you look at it in context, what it's clear that she's saying is she did not have enough information to declare them post-mortem wounds. She goes on to say, and I quote, she did not feel that he was definitely dead when he sustained the injuries to his nose and mouth when the dragging occurred. Exactly. That's the operative portion where she says she could not say that he was definitely dead. She couldn't say one way or the other, and therefore she couldn't declare them post-mortem wounds. But, again, even if he were alive, it doesn't prove that he was conscious. The aggravator requires conscious physical suffering. Well, don't we, again, don't we have the conscious physical suffering given the number of gunshot wounds that he sustained as he was trying to flee from Mr. Bush? I think that's what's at issue in Pavatt, to be honest. But then I want to go back to... Not really, but we'll get into that. Okay. Then I'm going to go back to, let's assume that these aggravators were established. This court has found prejudice under this exact standard, reasonable likelihood, when the heinous, atrocious, and cruel and continuing threat aggravators have been found. These are cited in the briefs. There are hooks where the court found a reasonable likelihood that the result would have been different where there were three aggravators, including the hack and the continuing threat aggravator. And Smith v. Mullins, where there were four aggravators, including the hack and continuing threat aggravators. Now, those were ineffective assistance of counsel cases. But it's the same standard, and the import is the same. Where you have a serious error, it's not dispositive that the hack and continuing threat aggravators were established. You still have to weigh the aggravation against the mitigation. And when you compare the aggravation to the mitigation, there's at least a reasonable likelihood that the judge might have felt differently about the subjective sentencing decision that he had to make. Was there medical evidence as regards his mental health in mitigation? I know there were family members, etc. There was very extensive mental health mitigation. Dr. Gail Pointer is the one who testified that he was suffering from bipolar disorder, that he had been misdiagnosed, that he had been inappropriately treated in the days before the offense, and that the drugs that he had been prescribed activated his mania and contributed to this offense. So, again, my position is that that's powerful mitigation. When you combine that with the fact that he didn't have a prior conviction for a crime of violence, and he had remorse and acceptance of responsibility, I think that that establishes a reasonable likelihood that... Well, the remorse thing sort of kicks us into one of your other issues. What do we do with the proffered evidence question? It does, and I think if the court is... Well, if the court has doubt about whether it was prejudicial, the Brecht Standard requires you to grant relief. But if you think that it's close to the line but doesn't quite establish prejudice, I think then you go to cumulative error, and you can take this Nash offer of proof into account. And when you combine those two things, the impermissible offer of proof and the victim impact testimony, it's really a classic case of a synergistic effect. Do we have any clearly established law that would guide us from the Supreme Court on this particular issue, the offer of proof question? There's clearly established federal law that state-sponsored courtroom practices can deprive a defendant of a fair trial, and that improper prosecutorial conduct can deprive a defendant of a fair trial. The first one is Carey v. Musladeen. The second one is Greer v. Miller. That's a general standard, that if there is unfair conduct that so infects the proceeding as to deny the defendant a fair trial, it's a due process violation. But the Supreme Court has said that a general standard can be applied unreasonably and support habeas relief. And it's not the case that the Supreme Court... So we don't have any Supreme Court case that's talked about an offer of proof? We don't, and that's not required. The Supreme Court doesn't have to separately take up each individual species of fundamental unfairness to clearly establish federal law. So the clearly established federal law is the defendant's basic right to a fair trial. And that undermined, this offer of proof undermined his basic right to a fair trial, because it was so prejudicial that it couldn't possibly be ignored. And I think that he did say that the prosecutor's offer said that the victim was alive when he was dragged, that Mr. Bush plotted the killing for days, that he taunted and tortured the victim, that he schemed to concoct an intoxication defense, that he was planning to escape and would murder people if he needed to to get out, and that he laughed about the killing and didn't have any remorse. The reason that that was synergistic with the other error is that it demonstrably affected what the victims would later testify to. Because the victim impact testimony, the victim's family was in the courtroom at the time that this proffer was given. Defense counsel asked to approach the bench to discuss this offer of proof, but the judge said, no, you can do it from there so that everybody can hear it. It demonstrably affected what the victim's family would later say. And also it had the effect of supercharging the state's case in aggravation and undermining the defense's case in mitigation, which is exactly the same thing that the victim impact testimony did. So when you combine these two things, I don't think there's any question that it rises at least to the reasonable likelihood standard. You cited Kerry as your support for clearly established law. That's one of three or four cases that I cited. And Kerry says Supreme Court holdings must be construed narrowly and consist only of something akin and on point to the question at hand. I do believe that it's on point because it establishes the defendant's basic right to a fair trial. Is that construing anything narrowly? I mean, that's just saying you should have a fair trial. So anything that happens that you would argue is unfair falls within habeas relief. It does if it's a state-sponsored courtroom practice. There's all different kinds of unfairness that can happen during a trial. Well, the proffer was a practice? It was a state-sponsored courtroom practice, yes, because the prosecutor stood up and did it. It's also a prosecutor. Well, you're not saying, though, that there's a procedure in Oklahoma, a criminal procedure that permitted him to do? No. When you say state-sponsored, I thought you meant... No, I mean that a state actor did it. When you say reasonable likelihood and you speak of what the state trial judge would have done, are you talking about this particular state trial judge or are you talking about a reasonably objective trial judge? It's objective. And that comes from Strickland, which talks about the reasonable likelihood standard. So you can't assume a lawless or unusually harsh or lenient decision-maker. You just assume an objective decision-maker. And if there aren't further questions, I'd like to reserve... Did you raise the victim impact argument with respect to this Nash proffer on appeal? I'm not sure that we raised that on direct appeal. Or in the district court. We did raise it in the district court. So let me see, I have it here. Yeah, so the effect on the victim impact testimony in the district court, it's at volume one of the record, note 27. But you didn't raise it on... Volume one of the record, I'm sorry, at page 62, note 27. You didn't raise it on direct appeal. I don't think that's required under Miller L versus Dredke, where the court says if you advance the basic claim in state court, that you can marshal new facts about what the evidence shows for the first time in federal court. So there's a distinction between the basic legal and factual claim that supports relief. And here, we said this offer of proof was unfair. And we cited the 14th Amendment. And then you can marshal different facts to show that that had an impact. And that's the Miller L case that we cited in our briefs. Thank you. Thank you. May I please the court? I'm Caroline Hunt from the Oklahoma Attorney General's Office on behalf of Respondent. I'll start with Propositions 2 and 3 concerning the victim impact testimony. And I would like to discuss the harmlessness of the victim impact testimony in this case. I'll cover two overarching reasons. First, the fact that this was a bench sentencing and not a jury sentencing and the consequences therefrom. And second, an application of the Dodd factors, as recently enumerated by this court in Underwood. First, as to the fact that this was a bench sentencing and the presumption that the trial court knows and follows the law. Petitioner's counsel this morning or this afternoon, this morning, sorry, has overstated the extent to which Oklahoma law permitted victim impact testimony. In fact, many of the descriptions he uses, pleading for the death penalty, inflammatory and speculative descriptions of the crime and the defendant, those are exactly the language the Court of Criminal Appeals has used to explain that such victim impact testimony is not permitted in Oklahoma at the time of petitioner's trial. While it is true that death recommendations were permitted, only a concise statement without amplification was allowed. And so here in the amplification, we must presume the trial judge disregarded. Furthermore, Oklahoma law limited descriptions of the crime and defendant. Well, how do we get past the district court or the trial court disregarding it when counsels argued that the OCCA has said several times it's okay to consider this? As to the booth, as to a limited concise recommendation, I concede that the trial court believed under Oklahoma law he could consider that. However, as to the things beyond that, in fact, the vast majority of what petitioner claims on appeal was improper, was actually redacted from these statements. When the prosecutor filed the statements, it was highlighted what was supposed to be read, and that highlighting appeared in the state's exhibits as well. And anything beyond the concise recommendation, any amplification was redacted. Many of the descriptions of the defendant in crime, for example, Mr. Harrington's brother's Indian folklore anecdote was redacted. And while these statements were ultimately read in full before the trial court, we know that... Read as redacted? Not as redacted, Your Honor. They were read in full without the redactions. However, because this is before a trial court, and there is a presumption that the trial court knows Oklahoma law and follows it, we can presume the trial court disregarded those descriptions. Is it rebuttable? Yes, I think it is a rebuttable presumption. Were there any factors that would weigh in favor of rebutting her? No, Your Honor. What about the exclamation points in the orders? I've never seen that before. I don't... There's no evidence that the trial judge even typed his own orders. Is there any evidence there were exclamation marks in any other order of this trial? I looked for that and I did not see any other exclamation points in his orders. And referred to the mother's, trying to assure her that he hoped that her faith in the justice system had been restored. That came from the victim impact statement. Yes, and can I say... He didn't ignore that then. Before I answer your question, Your Honor, I wanted to say one more thing about the exclamation points. That's a brand new argument. That was not made until the COA application in this court. But to answer your question, Judge Phillips, those came in the judge's prefatory remarks, before he discussed what he considered in sentencing. And moreover, what the judge said is this, I hope that some confidence has been regained in the legal system, a system where competent prosecutors and defense attorneys present their cases to the best of their ability. It is not, I hope your confidence will be restored once I impose a death sentence. And it is the litigation that's happened up until now. The petitioner entered an Alford plea, was adjudicated guilty. And this is responsive to Mrs. Harrington's statement that her father's killer got completely off. Her story about that was not the difference between a death and non-death sentence. If it's rebuttable, can you give me an example of what you think might have rebutted? For example, when the trial court here got into his description of what he considered, the aggravation, the mitigation, and an outweighing finding, if he had said then, I consider the victim impact, because that's the only place Oklahoma law allowed him to consider victim impact testimony. It cannot be considered until finding that the aggravation outweighs the mitigation. And so, for example, if the trial court had said at that point, I found that the aggravation outweighed the mitigation, and then I considered the victim impact testimony, and I pronounce a sentence of death, then that, for example, could weigh against the presumption. But here, the trial court made no such mention of the victim impact testimony in his sentencing statement. What about counsel's argument that the judge here thought it was admissible? It's not a question of presuming that the judge did not consider inadmissible evidence. It's a question that the district court considered evidence he thought was admissible. But much of what Petitioner challenges the trial court would not have believed was admissible. Again, we can look to the redacted statements, which by and large, again, the things Petitioner challenges were either redacted or were brought up, were basically off script, brought up for the first time on the stand. And I cannot defend why the attorneys didn't speak up when they read beyond the redactions, but the trial court routinely hears victim impact testimony, including in formal sentencing and non-capital cases, and was perhaps trying to give a voice to the victim's family. But, again, Oklahoma law did not allow the vast majority of what Petitioner challenges. But there were improper statements that weren't redacted, correct? You're right, Your Honor. You're right. The death recommendations themselves, even the concise statements, should have been redacted. There were some descriptions of the defendant that should have been redacted. But by and large, and I'll just go through some of these that were redacted from Petitioner's brief. Bobby Harrington's statement, the system protects the offender more than the victim. It's not advisable for me to say what he wants as far as punishment. That was redacted. I ask that your decision be based on the need for justice and protection. That Ronson Bush will kill again, that was redacted. Casey Harrington, Mr. Harrington's daughter's statement, to consider the cruelty and abuse that my daddy suffered because of Ronson, that was redacted. But, again, when you said it was redacted, and then you followed that up by saying, but all of it was read. Yes, you're right, Your Honor. I don't get the point of the redaction. How is that significant if it ends up all being read to the district court? Because the trial court had the redacted versions in front of him as state's exhibits and knew that those things were improper under Oklahoma law. When the prosecutor filed her cargo notice with the attached statements redacted, she said, Oklahoma law places a duty on the prosecutor to redact things from victim impact statements that aren't in compliance with the law, and that's what they did. And so it is, so that is my position, is that though they were ultimately read in full, it provides evidence that the trial court understood that many of these statements were not permitted under the law. And the second reason this court should reject petitioner's claim of harm is based on an application of the Dodd factors, which overall overwhelmingly favor the state. First, this was a highly aggravated and strong case for death. You concede the first point, the drumbeat. Yes, Your Honor, I concede that. It is not quite as many in Dodd, but here we had four of five as opposed to six of seven in Dodd. Casey Harrington, the daughter, her death recommendation was only in the written statement. It was not read aloud, so that's why it's four and not five. As far as the aggravation, petitioner's contention that these aggravators were not supported by the evidence or not weighty betrays a misunderstanding of both Oklahoma's law governing these aggravators and the evidence in this case. First, as far as the especially heinous, atrocious, and cruel aggravator, this aggravator has a two-part definition, and he entirely ignores the second prong. As to the first prong, whether the murder was preceded by either torture of the victim or serious physical abuse, which is established by conscious physical suffering. Here, Mr. Harrington's bloody footprints tell us that while he was being shot six times, he staggered from the living room recliner, collapsed in the kitchen, managed to get back up, go back through his living room, go outside into the cold December air, barefoot, wearing only a T-shirt and shorts, and then eventually collapsed. The medical examiner testified that there's no evidence any of the gunshot wounds would have rendered him unconscious. There were none to his head or brain stem. There was only one wound that would have alone been fatal, and it was not instantly fatal. One of the bullets punctured his lungs, which would have compromised his breathing, adding additional conscious physical suffering. And then on to the second prong of the aggravator is whether the crime is heinous, atrocious, or cruel. Oklahoma law defines heinous as extremely wicked or shockingly evil. Atrocious means outrageously wicked and vile, and cruel means pitiless, designed to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of others. And this second prong is not limited to conscious physical suffering. And here we have overwhelming evidence of the second prong. After shooting Mr. Harrington, a petitioner tied Mr. Harrington to his own truck and dragged him to the back of Mr. Harrington's large acreage. This caused catastrophic blunt force trauma to Mr. Harrington, clearly qualifying as heinous, atrocious, or cruel under the definitions I provided. Is there any evidence that he was alive? Any definitive evidence that he was alive during the dragging? Yes, absolutely, Your Honor. As this court discussed with petitioner's counsel, the medical examiner testified in her opinion that the victim was still alive when the blunt force trauma was sustained because of the nature of his red wounds, which shows that the heart was still pumping blood. And that's on pages 1112 to 1113 of Volume 6. As far as petitioner's focus on the medical examiner not being able to definitely say, that's what I always see medical examiners say. They say, I wasn't there, I can't say with 100% certainty, but they testify as to the evidence they see on the body, and here the red wounds shows the heart was pumping blood, so we know he was alive. And in any event, there's not a requirement that he be alive or conscious of physically suffering while being dragged under the second prong. And in this case, even after Mr. Harrington was dead, the pitiless nature of this crime continued. Petitioner took Mr. Harrington's cell phone and tried to reach Stephanie Morgan, but instead he accidentally dialed Mr. Harrington's parents. And so at that point, they begin to panic. In particular, Mrs. Harrington, Mr. Harrington's mother, because she was there the week prior when petitioner had broken into Mr. Harrington's home. And she starts to worry that something has happened to her son. And there were numerous phone calls between petitioner and the Harringtons, but there was one in particular that was outrageously cruel and pitiless. There was a 19-minute phone call between petitioner and Mrs. Harrington in which she is begging him to tell her if something has happened to her son. She even asks if there has been a shooting, but petitioner continues to evade her questions and even presses her on whether Mr. Harrington and Stephanie Morgan had been together and also discusses coming over to her house for the upcoming Christmas holiday. And finally, toward the end of this 19-minute phone call, during which she testifies that she knew in her heart something had happened to her son, she begs petitioner to let her speak to Mr. Harrington. And she can hear him get out of the truck. She can hear leaves rustling as he's walking. And he says, Billy's about 50 feet away. And then when he apparently reaches Mr. Harrington, he says, Billy can't talk right now. And under the second prong of this aggravator, it is heinous, atrocious, and cruel to stoke the anxiety of the family of Mr. Harrington when they believe something has happened to him and are trying to reach him. As far as the continuing threat aggravator, petitioner focuses on the fact that there wasn't a previous conviction of a violent offense, but this aggravator encompasses much more than that. Here, petitioner showed an escalating disregard for the law described at length by both the trial judge and the Court of Criminal Appeals. So I will just touch on some of the categories of evidence that petitioner ignores. The domestic violence against Stephanie Morgan, leading to her taking out a protective order, which he repeatedly violated in this case, including on the night of the murder when he broke into her home after killing Mr. Harrington and having those phone calls I discussed. And then even after he was jailed for this murder, he continued to try to reach her and gave out her phone number to other individuals to try to have them reach her on his behalf and harass her over who she was sleeping with. There are his two jail escape attempts, which are shown by evidence entirely independent of the Nash offer of proof. He also, there was a shank discovered in his jail cell. And finally, the callous and remorseless nature of this murder itself, as I've already described. As far as petitioner's contention that he showed his remorse and confessed, there are several interviews with him. And that is, in my opinion, not an accurate description to just simply say he confessed. In fact, his story continually changed. At first, he denied memory of what exactly had happened. At one point, he said that the conversation between him and Mr. Harrington, where Mr. Harrington basically came to him and confessed that he'd been sleeping with Miss Morgan, happened the Friday before the killing, which was on a Monday. Later, that story changed and he said that he and Mr. Harrington were sitting together and petitioner wanted to call Miss Morgan and Mr. Harrington said no. And so when petitioner pressed him on it, he confessed that he'd been sleeping with her. And then finally, he landed on the story that they were discussing Christmas gifts and claimed that Mr. Harrington said what he did, which there's no evidence to support that. Miss Morgan and Jimmy Barrington, Mr. Harrington's best friend, both emphatically denied that there was anything going on between Mr. Harrington and Miss Morgan. When did he ultimately confess then? So he did confess some involvement immediately upon being picked up. But then there were a series of interviews and I think the latest of those was where he finally used the story that was given at trial. Let's see. I want to say it was around, let's see, okay, I found it. That was December 29th and the murder happened December 22nd. And so our first interview was early in the morning on December 23rd. Then there was one mid-morning on the 23rd. And then again, he spoke with the OSPI investigator on December 29th. Talking about the aggravators, something kind of bothers me and I don't know that it's even in play, but let me run it by you, which is this is a very unusual case and that we have an Alford plea to first degree murder. Yes. When the only facts that we really have are we know that within a 29 minute period, Mr. Harrington's girlfriend had called Mr. Harrington, heard Mr. Bush in the background, all is well. And then within 29 minutes, this murder must have occurred. This death must have occurred. Yes. And what is alleged, what he says, of course, the defendant is that it was a flash. It's a spark of anger over this. You slept with Stephanie Morgan. What? Which makes some sense. And I don't know that there's any evidence of premeditation or anything else. In other words, unlike most death cases, real big question in my mind, if we even have a first degree murder. And so does that bleed into the aggravating circumstances? Can I consider that? And I know Alford's past this. I don't hear any arguments about that. Right. I would say, Your Honor, not as much to the aggravators. I think there could perhaps as to continuing threat and certainly as to one of the Dodd factors, which was the strength of guilt. So legally, I think it can be considered. However, I think there is overwhelming evidence of first degree murder in this case. And I'll explain that. So first, after the entry of the Alford plea, a lot of the evidence that would have come in in first stage came in in second stage. And in fact, when the prosecutor explained, normally what would happen in a second stage is all the evidence would be incorporated. Because those things matter, of course, often to the aggravators, like especially heinous, atrocious or cruel. And under Oklahoma law, the intent to kill can be formed in an instant. It does not have to be premeditated in the sense that it was formed hours or days before. Furthermore… So can you have a crime of passion that's first degree murder in Oklahoma? Yes, if there was not adequate provocation, which is one of the points I would like to make is that under Oklahoma law, it is black letter law that adequate provocation is required and that words alone are not enough, no matter how offensive. And so that is one reason that a potential heat of passion manslaughter claim would fail. Furthermore, a petitioner broke into Mr. Harrington's house the week before the murder and the situation was actually eerily similar to what ultimately happened. He had guns laid throughout the house and he had 357 bullets in his pocket. And those were the bullets he ultimately… Not those specific bullets, I don't know that, but that was the type of bullet used to kill Mr. Harrington the next week. And on that particular occasion, Mr. Harrington suspected something was up and had his friend Jimmy Barrington come over with him and the sheriff was called. And moreover, petitioner told Stephanie Morgan, if he ever saw her dating anyone else, he would kill that person. And that's on volume 7 of the transcripts, page 1378. And so those are all the reasons that the evidence of guilt is overwhelming in this case and it could not be a heat of passion manslaughter case. As recognized, and this brings me to my next point, which was that was one of the issues in Dodd, was that it was not a clear-cut case of guilt. And here we have that. And he did repeatedly confess. Well, his story changed, there's no doubt. He's the person who killed Mr. Harrington. Well, and in Dodd, was there a jury, that was a jury case, was there a finding of heinous, atrocious and cruel and also continuing threat? That's correct, Your Honor. It was a jury case and they rejected both of those aggravators. So that makes this case different from Dodd. Yes, absolutely, Your Honor. And moreover, there have been cases, and again, these were jury cases, whereas here we have a trial court judge where this court has found to be harmless victim impact testimony similar to what happened here. And I can file a 28-J letter with the citations, but I would direct this court to Gary Welch v. Workman, where this court said that the victim impact testimony was not, it's not to say it was only marginally offensive. It violated every category of impermissible expression. Each family member characterized Welch as an animal or a parasite and implored the jury to impose death. And despite this, this court was not left in great doubt, particularly in light of the overwhelming strength of the heinous, extreme threat aggravators, like in this case. DeRosa v. Workman also involved pleas for the death penalty and speculative and inflammatory claims about the victim's experience of the attack, but it was harmless in light of the overwhelming evidence of two aggravators. And Willingham v. Mollen, there there was, again, speculative and inflammatory details about the crime and pleas for the death penalty. And one of the victim's family members described the retribution she demanded and again, this was in front of a jury. She said that Mr. Willingham ought to be confined to a small area, beaten, and made to crawl to try to get away, beg for his life, and choke on his own blood. And again, this court found that to be harmless in light of the strength of the heinous, atrocious, and cruel aggravator and the weak nature of the mitigating case, which I would like to get back to in a moment in Petitioner's case. And then finally, I would also direct this court to Hain v. Gibson, where four out of five victim impact witnesses gave death recommendations, like in this case, and four made comments on the defendant and the crime, but it was found to be harmless in light of the heinous, atrocious, and cruel and continuing threat aggravators and the substantial evidence of guilt. And finally, back to the Dodd factor regarding the weak mitigation case, especially when it's weighed against the aggravation case. Here, Petitioner had a completely unremarkable childhood, especially compared to the typical capital defendant. In fact, his social history expert, Dr. Music, said it's very unusual to see a capital defendant who came from such good, solid people that Petitioner did, in particular his two biological parents and his stepdad. There was no abuse in his past like we often see. And quite frankly, he had an almost idyllic childhood, working on the farms owned by both sides of the family, riding four-wheelers. He had his own horse, and he was continually given jobs and opportunities by his family. As to Petitioner's claim that his crime was explained by Celexa, which he says exacerbates bipolar disorder and is known to provoke violence in people with bipolar disorder, this claim was thoroughly refuted at trial. In fact, Petitioner had been on SSRIs like Celexa previously, and his own reported symptoms belie a claim that it invoked aggression against him. He had previously made no reports of irritability or aggression. Instead, he claimed that he felt weird out of it and a lack of emotion, which is the opposite of aggression. And moreover, his trial expert, Gail Pointer, simply assumed that aggression was explained by Celexa in his case based on reports suggesting a very small percentage of people experienced such an effect. And she also testified as to people who are poor metabolizers of serotonin which would cause a buildup in the brain. And that's kind of her explanation of the science behind why an SSR could aggravate someone and cause aggression. But she admitted that she had not tested Petitioner to see whether he was a poor metabolizer. Moreover, there's no evidence that Petitioner was on Celexa the week prior when he broke into Mr. Harrington's home, as I've already described. Well, these two people are best friends, longtime friends. Yes, Your Honor. What is your explanation? I think Petitioner thought in his own head that there was something going on between Mr. Harrington and Stephanie Morgan. Despite no evidence to the contrary, he seemed obsessed not just with Mr. Harrington, but also with other people he thought were sleeping with her. I mean, he continued to be obsessed with this even after he was in jail for this crime. And so I think that may have been part of what drove him. I don't believe that Mr. Harrington ever said anything that would lead him to that. But when Petitioner was picked up that night at Stephanie Morgan's house, he said, he repeatedly said, he effed my wife. Called her various things, wife, fiance. And so while his story changed about how exactly it all unfolded and how much he'd been drinking and whether he was angry, he did say that from the beginning. And if this Court has no further questions, I would ask this Court to please affirm the denial of habeas relief. Thank you. Thank you. Even if the aggravators were established, prejudice is shown by the compelling case and mitigation. Even the state's explanation of the offense makes this clear. No one disputes that Mr. Bush was seriously mentally ill and in the grips of a manic episode at the time of the offense. A manic episode causes paranoia, which is Mr. Bush believing that Mr. Harrington was sleeping with his ex-girlfriend and a serious lack of judgment. I think going to Judge Phillips's point, I can't imagine that this offense would have occurred, but for the fact that Mr. Bush was seriously mentally ill and in the grips of a manic episode. We often do not see mitigation that is that compelling and has that type of a connection to the offense. And all of the aggravation evidence is also mitigated by the fact that he was seriously mentally ill and lacked judgment at the time. Now, the state says that the judge would have ignored the more inflammatory aspects of this evidence, but we know that he didn't, because defense counsel did object under Oklahoma law and the judge allowed the testimony even over an objection under Oklahoma law. My opposing counsel talks about the Indian folklore comparing him to a snake thing. There was a specific objection to that in particular and she said, I object to the comparison to Mr. Bush as a snake and the judge said overruled. So there's no question that the judge... So that testimony should have been redacted. Is that what you're saying? The snake testimony? I'm saying that the snake testimony was inadmissible. The judge obviously thought it was proper because he overruled an objection. He could have just said, well, that's been redacted. Anyway, I see here on my statement. Right. Do you argue about the snake testimony in your brief? Oh, yes. It was argued in state court, in my habeas petition and in the brief. Dr. Pointer's testimony was not thoroughly refuted at trial and in fact, the state has taken just the opposite position with respect to the ineffective assistance of counsel claim. So they can't very well say that it was thoroughly refuted when they say in response to the ineffective assistance of counsel claim that actually she did establish a link between the drug and the offense. So I see that my time is up. So I'd ask the court to reverse and order a grant of habeas relief. Thank you. Thank you both for your arguments this morning. They were both very strongly presented and convincingly presented. I appreciate it as does the panel. The court is adjourned in recess until call.